UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ALISSA M. SNEED,

        Plaintiff,                      Civil Action No. 2:12-15203

    v.                             District Judge Robert H. Cleland
                                           Magistrate Judge Laurie J. Michelson

COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.
_____/

**REPORT AND RECOMMENDATION TO
GRANT IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [10] AND
DENY DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [14]**

For approximately ten years and until June 2009, Plaintiff Alissa Sneed worked as a bus driver. In 2002, Sneed started having persistent problems with depression and anxiety. In 2007, Sneed was diagnosed with lupus. In June 2009, she was diagnosed with a progressive movement disorder, spinocerebellar ataxia type 2. Sneed maintains that these conditions prevent her from working any job on a full-time basis. As such, in November 2009, at age 30, she applied for social security disability insurance benefits and supplemental security income. An administrative law judge acting on behalf of Defendant Commissioner of Social Security concluded that Sneed was not under a "disability" as that term is used in the Social Security Act.

Sneed filed this suit to challenge that conclusion. (*See* Dkt. 1, Compl.) All pre-trial proceedings have been referred to this Court. (Dkt. 3.) Before the Court for a report and recommendation are the parties' cross-motions for summary judgment. (Dkts. 10, 14). As detailed below, this Court finds that the ALJ did not provide "good reasons" for rejecting the opinions of

Sneed's long-time treating psychiatrist. Further, the ALJ did not adequately explain how Sneed can perform "unskilled" work despite her limitations in concentration, persistence, or pace. Accordingly, this Court RECOMMENDS that Sneed's Motion for Summary Judgment (Dkt. 10) be GRANTED IN PART, that the Commissioner's Motion for Summary Judgment (Dkt. 14) be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be REMANDED for further proceedings.

## I. BACKGROUND

### A. Procedural History

In November 2009, Sneed applied for disability insurance benefits and supplemental security income asserting that she became unable to work on November 18, 2009. (Tr. 26.) These applications were denied at the initial review level in March 2010. (*Id.*) Sneed then requested an administrative hearing, and on May 17, 2011, she appeared with counsel before Administrative Law Judge Mary Ann Poulose ("the ALJ"), who considered her case *de novo*. (*See* Tr. 26-36, 41-70.) In a June 9, 2011 decision, the ALJ found that Sneed was not disabled within the meaning of the Social Security Act. (*See* Tr. 26-36.) The ALJ's decision became the final decision of the Commissioner of Social Security on November 14, 2012, when the Social Security Administration's Appeals Council denied Sneed's request for further administrative review. (Tr. 1.) This suit followed. (Dkt. 1, Compl.)

### B. Medical Evidence

Sneed has been diagnosed with lupus[1] and spinocerebellar ataxia. She also has a lengthy

---

[1]The Court notes that the medical record is not entirely clear on this point. Two office notes by the physician who treated Sneed for lupus indicate treatment for "possible" lupus. (Tr. 478, 492; *but see* Tr. 491.) The ALJ, however, found that Sneed's lupus was a severe impairment (Tr. 28) and her focus was on the functional limitations caused by (possible) lupus rather than the precise diagnosis. As such, the Court will assume that Sneed has a confirmed diagnosis of lupus.

treatment history for depression and anxiety. The Court first summarizes the medical evidence pertaining to Sneed's lupus and spinocerebellar ataxia. The Court then summarizes Sneed's mental-health treatment records, partitioning that summary by the alleged onset date.

### 1. Medical Treatment for Sneed's Physical Impairments

Sneed was first diagnosed with lupus in 2007. (*See* Tr. 270, 487.) Lupus is a disease that causes the immune system to "attack[] healthy cells and tissues by mistake." Medline Plus, *Lupus*, http://goo.gl/j7A2 (last visited Jan. 23, 2014). Dr. Patricia Dhar, a rheumatologist, was primarily responsible for treating Sneed's lupus at times relevant to Sneed's disability applications. (*See* Tr. 415-521.)

In March 2009, on the recommendation of Dr. Dhar, and because of her own concerns about spinocerebellar ataxia, Sneed had a consultation with Dr. James Garbern, a neurologist. (Tr. 332-35.) Spinocerebellar ataxia ("SCA") "refers to a group of genetic disorders characterized by slowly progressive difficulties with gait, hand movements, speech and abnormal eye movement. . . . People with SCA have progressive damage in the areas of the brain that control movement in the arms, legs, hands, and eyes." Program Operations Manual System § DI 23022.500 Spinocerebellar Ataxia, available at http://goo.gl/kPAoBz (last updated Feb. 26, 2010). Dr. Garbern wrote, "for the last year or more [Ms. Sneed] has noticed gradually increasing problems with her balance and tendency to veer off or stumble more, although without actual falls." (Tr. 332.) On exam, Sneed had full strength in all her extremities. (Tr. 334.) She "was able to stand and walk on her toes and heels without difficulty" but did have "mild difficulty" with tandem walking (walking by placing the heel of one foot immediately in front of the toe of the other). (Tr. 334.) "My impression," wrote Dr. Garbern, "is that Ms. Sneed has family history consistent with and confirmed to be caused by spinal cerebellar

ataxia type 2. Although rather subtle[,] I do think that Ms. Sneed [has] sufficient clinical findings . . . consistent with [the] disorder [to] justify genetic testing." (Tr. 334.)

On June 17, 2009 (a few days before Sneed's alleged disability onset date), genetic testing confirmed spinocerebellar ataxia type 2 ("SCA2"). (Tr. 394; *see also* Tr. 329-31.)

In November 2009, Sneed had a follow-up appointment with Dr. Garbern. (Tr. 329-31.) He noted, "Ms. Sneed remains off of work and she now seems to be coming to grips with the need to find alternative employment that does not require operation of either motor vehicles or other heavy machinery." (Tr. 329.) Dr. Garbern opined,

> My assessment is that [her SCA2] seems to be slowly progressing and fortunately her genetic testing indicates that her repeat number is of the same size as others in her family and so I do not anticipate that there will be dramatically different rate of progression of the disorder in her and that hopefully some of her perceived relative disease severity is more related to her anxiety over the disorder than to the disorder itself.

(*Id.*) He continued Sneed on Lamotrigine (a seizure medication) and prescribed Buspirone for both her anxiety and SCA2. (*Id.*)

In February 2010, Sneed saw Dr. Dhar. (Tr. 478.) Sneed reported taking one Motrin as needed for her joint pain. (*Id.*) Dr. Dhar thought that Sneed's lupus was "[c]ontrolled." (Tr. 479.)

Also in February 2010, Dr. Abigail Neal, an internist, evaluated Sneed for Michigan's Disability Determination Service ("DDS"), a state agency that helps the Social Security Administration evaluate claimants in Michigan. (Tr. 343-45.) Sneed reported that she had lupus and that it affected her knees, hips, and fingers, and that her fingers would occasionally swell. (Tr. 343.) Dr. Neal noted, "She used to drive a bus. She cannot do this any longer because of her joint pains. She can't sit for over an hour." (Tr. 343.) Sneed also reported symptoms attributable to SCA2: her

4

balance and coordination were "off," she ran into things and dropped things, her writing had changed, she could not ride a bike or skate, and she could only wear flat shoes. (Tr. 343.) On exam, Dr. Neal found that Sneed had a normal gait, had normal fine and gross dexterity, could write a sentence normally, could perform finger to nose normally, was able to walk on her toes and heels, and could get in and out of a chair without difficulty. (Tr. 344-45.) Dr. Neal summarized, "There [are] no gross neurologic abnormalities noted other than her minimal difficulty with tandem gait." (Tr. 345.)

On May 12, 2010, Dr. Garbern authored a "To Whom It May Concern" letter. (Tr. 388.) He wrote, "I already think that Ms. Sneed's coordination has deteriorated to the point that it is not safe for her to be driving a bus, both for her own safety as well as that of her passengers. In addition, SCA2 causes progressive difficulty with walking and standing and with speech as well, so I believe that this is a condition that prevents Ms. Sneed from working at all." (Tr. 388.)

A few days later, on May 17, 2010, Sneed had an office visit with Dr. Garbern. (Tr. 525-26.) Dr. Garbern's relevant exam findings are essentially identical to those from November 2009 except that tandem walking was "perhaps slightly worse than it was last fall." (Tr. 526.) He opined that Sneed's fatigue was likely attributable to "one or more" of her lupus, depression, and SCA2. (Tr. 526.) He remarked, "Unfortunately, SCA2 is a relentlessly progressive disorder and I think that although she would probably be able to perform some job tasks at the present time, eventually these will be unrealistically performed duties even for relatively menial tasks; and I think it is appropriate for her to apply for disability at this point." (Tr. 526.) Dr. Garbern provided that he was moving his practice so Sneed would continue her treatment with Dr. John Kamholz in the future. (*Id.*)

That same day, May 17, 2010, Dr. Garbern completed a "Physical Residual Functional

5

Capacity Questionnaire." (Tr. 390-93.) The questionnaire asked Dr. Garbern to list Sneed's symptoms; he provided, "worsening coordination, balance, fatigue."(Tr. 390.) He also provided that Sneed's depression contributed to her condition. (*Id.*) Dr. Garbern indicated that Sneed's symptoms would "frequently" interfere with the attention and concentration needed for simple tasks, i.e, that for "34% to 66% of an 8-hour working day" Sneed would be unable to pay attention or concentrate sufficiently to perform simple tasks. (Tr. 391.) He also indicated that Sneed was "[i]ncapable of even 'low stress' jobs." (*Id.*) Dr. Garbern opined that Sneed could sit for 30 minutes at one time and "less than 2 hours" total in an eight-hour day and could stand for 10 minutes at one time and "less than 2 hours" total in an eight-hour day. (Tr. 390-91.) When asked how much weight Sneed could lift and carry, he provided that she could "[n]ever" lift "[l]ess than 10 lbs" (the lightest option on the questionnaire). (Tr. 391.)

In March 2011, Sneed saw Dr. Kamholz. (Tr. 523-24.) His notes are hard to read, but he apparently found that Sneed's speech was slurred. (*See id.*) He noted that her walking and balance were "ok." (Tr. 524.)

Sneed also saw Dr. Dhar in March. (Tr. 491-94.) Sneed reported that she was still taking Motrin for joint pain as needed, and Dr. Dhar again noted that Sneed's lupus was "[c]ontrolled." (Tr. 492.)

### 2. Mental Health Treatment Prior to the Alleged Disability Onset Date

In March 2002, Sneed found out she was pregnant, was having problems with her boyfriend, and was concerned that she would be "disfellowshipped" from her (Jehova Witness) temple due to the pregnancy (which did end up happening the next month). (Tr. 233; *see also* Tr. 235.) Dr. Nelly Manganas, a psychiatrist who Sneed had seen before and who would treat Sneed frequently over the

6

next six years, was concerned about the deterioration in Sneed's physical condition and her depression. (Tr. 233.) So she started Sneed on Prozac. (*Id.*) In May 2002, Sneed reported that she was not permitted to work as a bus driver so long as she was on Prozac. (Tr. 237.)

It appears that Sneed resumed work in late 2003 or early 2004. (*See* Tr. 246.) In January 2004, Sneed had been off her medication for over a month and had become more irritable and easily agitated. (Tr. 247.) Dr. Manganas started Sneed on Lexapro. (Tr. 247-48.) In February 2004, Sneed was "struggling with her work to find a job away from driving the bus route." (Tr. 248.)

In May 2004, Sneed "finally got into a light duty job, a desk job." (Tr. 250.) Lexapro gave Sneed headaches though, and so Dr. Manganas restarted Prozac. (Tr. 250.) In June 2004, Sneed reported doing well, but in September she ran out of medicine and "notic[ed] fairly quickly the change . . . in her mood." (Tr. 252.) In October 2004, Dr. Manganas noted, "She can not explain why she chose to stop the medication and why she hasn't scheduled follow-up appointments since last time. Apparently her father has also noticed the change in her and encouraged her to contact me for that reason she made the appointment today." (Tr. 252.)

In 2005, Sneed continued to work, except during the summer when her employer placed her on leave. In September 2005, Dr. Manganas referred Sneed for counseling with Tracey Torosion, Ph.D., but Sneed only went for three visits, "got sick[,] and canceled the visits after that." (Tr. 256-57.)

Sneed's mental health in 2006 was similar to 2005. In April 2006, Dr. Manganas wrote, "She reports that she ran out of the Prozac about a month ago and has not called for a prescription." (Tr. 258.) Not long thereafter Sneed was placed on leave from work; in July 2006, Dr. Manganas noted, "She is still not working as work has put her on a leave, which had happened last summer." (Tr.

258.) Sneed was "suffering financially from that situation." (Tr. 259.) In September 2006, Sneed reported doing well, but was anxious to return to work. (Tr. 260.) She could not do so, as a driver at least, while on medication. (*See id.*) Dr. Manganas and Sneed agreed to a trial period without medication. (Tr. 260.) It appears that Sneed then returned to bus driving. (*See* Tr. 261.)

By January 2007, however, Sneed was feeling more nervous and anxious but was "trying very hard to cope with the problems at work with driving a bus." (Tr. 261.) In March 2007, Dr. Manganas noted, "She is not taking care of herself. . . . She barely eats one meal a day and has lost weight and is feeling tired and is sleeping all the time." (Tr. 262.) Dr. Manganas prescribed Zoloft and put Sneed on a leave of absence. (Tr. 262-63.) In September 2007, Dr. Manganas noted, "she indeed shows some degree of mild Bipolar which have not been apparent and she has not chose to tell me about it before." (Tr. 265.) Dr. Manganas continued Zoloft but also started Lamictal. (Tr. 265.) In October 2007, Sneed reported that "she ha[d] never felt normal until [taking] Lamictal. For the first time in her life she felt that she [could] act in a normal way." (Tr. 266.) Unfortunately, Lamictal caused Sneed to have the side effect of itching and she "decided that it [was] not something she [was] comfortable with and she felt that she ha[d] to be off of work in order to do that." (Tr. 267.)

In April and May 2008, Sneed saw Dr. Desanka Stipic, a psychiatrist in the same office as Dr. Manganas, during Dr. Manganas's temporary leave. (*See* Tr. 271-72, 277.) In April, Sneed told Dr. Stipic that she had stopped her medications in February 2008, and, while she had not noticed that her mood was problematic, her mother noticed irritability and people at work noticed that she could not deal with conflict. (Tr. 271.) Sneed reported early-morning awakenings, panic, and suicidal ideation. (*Id.*) Dr. Stipic restarted Zoloft and increased Trileptal. (*Id.*) At an appointment in April,

Sneed reported alcohol abuse; Dr. Stipic wrote, "[patient] denies suicidal state[,] but was confronted [regarding alcohol] use as parasuicidal." (Tr. 272.) Dr. Stipic placed Sneed on a leave of absence from work. (Tr. 277; *see also* Tr. 272.) At the following appointment, Sneed said that she had been inpatient with her children, irritable, fatigued during the day, sleeping poorly, dysphoric, hypersensitive, and had neglected her activities of daily living. (Tr. 274.) She had thoughts of killing herself via carbon monoxide poisoning. (*Id.*)

At some point, perhaps in late May 2008 (*see* Tr. 277, 278), Sneed had resumed working and, in July 2008, Sneed reported to Dr. Manganas that she had been working a lot, up to 20 hours of overtime (Tr. 278). Sneed said she was dealing with her passengers better than before and that Zoloft was keeping her depression at bay. (*Id.*) Because of Dr. Manganas' upcoming leave of absence, the two agreed to ask Dr. Stipic to become Sneed's psychiatrist. (*Id.*)

In the fall of 2008, Sneed continued to work, but with some difficulty. In September 2008, Sneed reported that she had an incident with a bus passenger who been verbally abusive; Dr. Stipic noted that Sneed had stopped taking her medications: "I don't like taking meds." (Tr. 280.) Sneed reported having fleeting suicidal ideation when she was off her medications. (*Id.*) In October 2008, Sneed reported a pattern of oversleeping and that she had hit the mirror of another bus because she had been preoccupied. (Tr. 282.) Dr. Stipic wrote, "[patient] has been *forgetting* meds." (*Id.*) In November 2008, Sneed reported that she had been working through some of her issues with Dr. Torosian. (Tr. 283.) Sneed told Dr. Stipic that she had suicidal thoughts: "[I'm] tired of being here." (*Id.*) Sneed also said she was avoiding coworkers, and had an argument with a coworker where she got very angry. (*Id.*) Dr. Stipic addressed "bipolar [illegible]" with Sneed and provided "a trial of Abilify for depression." (Tr. 284.)

9

On November 26, 2008, Sneed was hospitalized for a suicide attempt. (Tr. 197-203.) Sneed had broken up with her boyfriend and tried to kill herself via carbon-monoxide poising. (Tr. 202.) Upon admission, Sneed did not care that she had attempted suicide. (*Id.*) Her Global Assessment of Functioning score was 20 (*id.*), a score that indicates "[s]ome danger of hurting self or others," American Psychiatric Assoc., *Diagnostic and Statistical Manual of Mental Disorders* ("*DSM–IV*"), 30, 34 (4th ed., Text Revision 2000). Sneed was stabilized over a five-day hospitalization and discharged with prescriptions for Zoloft and Desyrel (Trazodone). (*Id.*) Her GAF at discharge was 50 (*id.*), a score that indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning," *DSM-IV* at 34.

At her December 2008 follow-up with Dr. Stipic, Sneed reported that she was taking Desyrel sporadically because it had not been helpful and that she had stopped taking Abilify due to sedation. (Tr. 286.) She had also stopped taking Trileptal, but acknowledged, "since I stopped[,] I don't like my kids." (Tr. 286.) Sneed's two children were approximately five and seven years old at the time. (*See* Tr. 45.) Dr. Stipic wrote, "she agrees due to the demands of her job with both service to [the] public [and] executive functioning impairments [secondary to] depression — [leave of] absence from her work is indicated." (Tr. 287.) Later in December, Sneed reported irritability, sadness, and inability to be around others, guilt, anhedonia, and over-eating. (Tr. 288.) Sneed's children were staying with her cousin. (*Id.*)

In January 2009, Sneed told Dr. Stipic that she was "ok." (Tr. 291.) Sneed was caring for her children and having more patience with them. (*Id.*) Sneed said that she had no irritability since her hospital stay and denied angry outbursts. (*Id.*) Dr. Stipic "[a]ddressed possible Bipolar II [with] mixed states" with Sneed, apparently asking her about a list of symptoms. (*Id.*)

10

By February 2009, Sneed was no longer taking Desyrel, Trileptal, or Abilify, but was taking Zoloft and Wellbutrin. Sneed felt better on this combination. (Tr. 294.) Dr. Stipic's notes reflect that Dr. Torosian, Sneed's therapist, was "pleased [with] her treatment progress." (*Id.*) Sneed reported no agitation, said she was sleeping well. (*Id.*) By March 2009, Sneed was working the 3:30 a.m. shift. (Tr. 297.) Her children were staying with Sneed's aunt during the week and Sneed was caring for them on the weekends. (Tr. 297.) In April, Sneed reported she would be starting a 10:00 a.m. shift. (Tr. 298.)

In early June 2009, however, Sneed reported to Dr. Stipic that she had not taken her medications over the prior month and a half: "I forgot it for a while." (Tr. 299.) Sneed reported that "[e]veryone [was] get[ting] on [her] nerves," that she had cursed one of her passengers, and that she had urges to throw things and hit people. (Tr. 299.) She also reported sadness in leaving her children after the weekend. (Tr. 299.) Dr. Stipic restarted medications: Zoloft and Wellbutrin. (Tr. 299.)

### 3. Mental Health Treatment After the Alleged Disability Onset Date

On June 24, 2009, Sneed reported to Dr. Stipic that she had an incident at work with passengers who were critical of her driving which eventually led to her calling dispatch and the police arriving on scene. (Tr. 300.) Sneed had not been sleeping well since her recent diagnosis of SCA2. (*Id.*) Sneed also reported fleeting suicidal ideation and a fear of others. (*Id.*) Dr. Stipic took Sneed off work. (Tr. 301.)

In early July 2009, Sneed reported increased depression with crying spells and loneliness. (Tr. 304.) She was preoccupied with her diagnoses of SCA2, her future, and "when I can't drive my kids to school." (*Id.*) Dr. Stipic also noted, "[patient] has been disavowed by her parents due to her being shunned by the Jehovah's Witness." (*Id.*) Sneed had a fleeting plan to kill herself and her

11

children but no active plan. (*Id.*) It appears that Sneed was not taking her full dose of Lamictal as she did not have money for it and had experienced some side effects. (*Id.*; *see also* Tr. 307.) In mid-July, Sneed rated her depression in the five- to nine-out-of-ten range and her anxiety at the seven-out-of-ten level. (Tr. 308.)

By the end of July, however, Sneed was taking Lamictal and told Dr. Stipic that she felt calmer and had been able to care for her children for a week without agitation. (Tr. 310.) Sneed was sleeping and eating well. (*Id.*) However, Sneed was "financial stressed" and was "ready to return back to work due to financial issues." (*Id.*)

On August 4, 2009, Sneed informed Dr. Stipic about a return to work. (Tr. 311.) She had driven a familiar route but still experienced nausea, headache, nervousness, and self-doubt, all of which interfered with her performance. (Tr. 311.) "She drove slowly and second guessed herself with each turn." (*Id.*) Dr. Stipic's plan was "slow titration of Lamictal" and to "hold Abilify and Xanax." (*Id.*)

On August 10, 2009, Sneed again attempted to commit suicide—this time by ingesting 30 Xanax and a half-brick of rat poison. (Tr. 211; *see also* Tr. 204-31.) Hospital notes indicated that the attempt was "precipitated by loss of job." (Tr. 211.) Additionally, the recent diagnosis of SCA2 and a repossessed car due to financial problems were stressors. (*Id.*) Sneed remained hospitalized until August 13. (Tr. 209-10.)

At her August 17 follow-up appointment with Dr. Stipic, Sneed reported that she had been staying at a girlfriend's house since being discharged from the hospital. (Tr. 312.) Dr. Stipic noted, "She has felt abandoned by family [and] [boyfriend]." (*Id.*) Sneed was "tearful [and] depressed" and her "suicidal status" was "ongoing." (Tr. 313.) The next day, Sneed told Dr. Stipic, "I hate my life."

(Tr. 314.)

In September 2009, Sneed reported rapid mood swings. (Tr. 316.) Dr. Stipic wrote, "happy to irritable to sad (within minutes)." (Tr. 316.) Sneed was taking Xanax and Abilify, but had not filled her prescription for Lamictal because of financial constraints. (Tr. 318; *see also* Tr. 316.)

By October 8, 2009, Sneed was taking Lamictal and her "down[s]" were not intense. (Tr. 319.) But Sneed was still having rapid mood cycling with racing thoughts and was not sleeping through the night. (*Id.*) Dr. Stipic noted, "focus [and concentration] fair for short periods only." (Tr. 319.)

On October 22, 2009, Sneed reported that she had stopped taking her medication for four days ("forgetting it") and felt worse. (Tr. 321.) She was struggling with depression and fleeting suicidal ideation and spent her entire check in a spending spree in an attempt to "feel better." (*Id.*) Sneed was easily irritated, "even [her] children bother[ed] her." (*Id.*)

It appears that things improved some for Sneed in November 2009. (Tr. 322-23.) Dr. Stipic noted, "[patient] reports less depression [and] taking meds as prescribed" (except that Sneed was only taking half the prescribed dosage of Lamictal due to financial constraints). (Tr. 322.) Further, Sneed was overreacting less. (*Id.*) Dr. Stipic's notes provide "[patient] denie[d] mood swings" but also "still cycling [with] mood [and] focus problems." (*Id.*) Dr. Stipic thought that Sneed remained "fragile" with respect to a reoccurrence of mood swings. (*Id.*)

Toward the end of 2009, Sneed's roommate influenced Sneed to stop taking her medications and Sneed had been smoking marijuana. (Tr. 353.) Depression set in after about three to four weeks with Sneed withdrawing to her bed (but unable to sleep) and experiencing suicidal ideation and focus and concentration problems. (Tr. 353.)

13

In January 2010, Dr. Stipic restarted Sneed's medications. (Tr. 354.) Sneed reported to Dr. Stipic that she had to file for bankruptcy and that she had moved out from her girlfriend's place. (Tr. 355.) She was depressed about her diagnosis of SCA2 and very nervous about driving. (Tr. 356.)

In February 2010, Sneed was taking her medications and reported "dealing [with] sadness [and] depression." (Tr. 357.) Sneed "denie[d] feeling . . . irritable all the time" but was still having poor frustration tolerance in certain situations, such as when her children were disruptive. (*Id.*) Sneed was still being shunned by her fellowship and family, and so Dr. Stipic called Sneed's father to discuss that issue. (Tr. 357-58.) Nonetheless, in March 2010, Sneed experienced another suicidal state "in the face of being shunned by her family." (Tr. 359.) Sneed was "[t]olerating her med[ications]" and reported slightly less depression, at the six-out-of-ten level. (*Id.*)

Also in February 2010, Dr. Surendra Kelwala, a psychiatrist, evaluated Sneed for Michigan's Disability Determination Service. (Tr. 338.) Sneed explained that her depression was characterized by anxiety, nervousness, and extreme sadness at times. (Tr. 338.) She denied any panic attacks. (Tr. 340.) Sneed also said she never had a problem with alcohol. (Tr. 339.) Sneed reported that she got along with her coworkers and employers but not the public "because they would ask stupid question[s] and would treat her badly for no reason, just because she was a bus driver." (Tr. 339-40.) In describing Sneed's attitude and behavior, Dr. Kelwala wrote, "The patient's contact with reality is okay. Her self-esteem, she said she feels like [she is] worthless since she has developed ataxia. She showed some psychomotor retardation. She was tense. She was unusual. She was pleasant. She had no tendency to exaggerate or minimize her symptoms." (Tr. 340.) Dr. Kelwala also noted that Sneed spoke in a "child-like manner." (Tr. 340.) Dr. Kelwala diagnosed Sneed with Major Depression, Recurrent, and assigned a GAF score of 50. (Tr. 341.) In a section of her report titled

14

"Medical Source Statement," Dr. Kelwala wrote, "She has cerebellar ataxia as well as chronic depression. Both of these are significant factors affecting her ability to work." (Tr. 341.)

In March 2010, James Tripp, Ed. D., reviewed Sneed's medical records and opined on her ability to function. (Tr. 369-85.) Dr. Tripp concluded, "[t]he preponderance of evidence in [the claimant's] file indicated that the claimant is able to perform simple and more complex tasks with persistence." (Tr. 385.) In reaching this conclusion, Dr. Tripp discredited Dr. Kelwala's medical source statement and, apparently referring to Dr. Stipic's October 22, 2009 notes (*see* Tr. 368, 381, 385), gave "[t]he treating source . . . controlling weight." (*Id.*) He wrote, "The [t]reating source stated that the claimant has improved with medication and therapy. The claimant continued to abuse Cannabis without rehabilitation intervention." (Tr. 385; *see also* Tr. 381 (noting that Sneed "smokes Cannabis [d]aily").) The record Dr. Tripp relied upon for his conclusion about Sneed's drug use in fact provided that it was Sneed's roommate who "smoke[d] pot daily." (*See* Tr. 321, 381.)

On May 27, 2010, Dr. Stipic completed a "Mental Residual Functional Capacity Questionnaire." (Tr. 396-400.) The psychiatrist provided that she had been seeing Sneed approximately every two to four weeks since September 2008. (Tr. 396.) She provided diagnoses of Major Depression, Recurrent, and Generalized Anxiety Disorder, and thought that Sneed's highest GAF score over the prior year had been 58. (Tr. 396.) Dr. Stipic indicated that Sneed experienced approximately half of 56 listed symptoms, including thoughts of suicide, perceptual or thinking disturbances, and "[r]ecurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom occurring on the average of at least once a week." (Tr. 397.) In terms of functioning, Dr. Stipic thought that Sneed was "unable to meet competitive standards" in five of sixteen "mental abilities and aptitudes to do

15

unskilled work": (1) complete a normal workday and workweek without interruptions from psychologically based symptoms, (2) perform at a consistent pace without an unreasonable number and length of rest periods, (3) accept instructions and respond appropriately to criticism from supervisor, (4) respond appropriately to changes in a routine work setting, and (5) deal with normal work stress. (Tr. 398.) The questionnaire defined "unable to meet competitive standards" as "patient cannot satisfactorily perform this activity independently, appropriately, effectively, and on a sustained basis in a regular work setting." (*Id.*) Dr. Stipic explained her assessment this way:

> Due to depressive and agitated states [patient] can show difficulty in sustained efforts (which can vary day to day) to attend, focus, and complete activities of daily living (self care [and] care of children) let alone maintain the mental and emotional stability to interact with others. She can easily get discouraged and agitated and withdraw [from] work situations. She remains fragile ever since her leave from work as stressors have been removed. She is also preoccupied with her progression of spinal ataxia [illegible] . . . on her future.

(Tr. 398.)

In June 2010, Sneed was taking Lamictal and rated her depression at the three-out-of-ten level and her anxiety at the five-out-of-ten level. (Tr. 413.) Sneed denied symptoms of anger, irritability, or sadness. Still, Sneed reported that her attention was poor, and that she was waking at 2:00 a.m. and could not fall back asleep until 5:00 a.m. (*Id.*)

In July 2010, Sneed reported that she had been off her medication for two weeks. (Tr. 411.) In December 2010, Sneed reported that she had not missed taking her medications for longer than a 24-hour period. (Tr. 405.) Dr. Stipic noted "short lived downs" (about 24-hours) and no "highs" or angry or irritated states. (Tr. 405.) Sneed did have a period of withdrawing to bed but was attending to her activities of daily living and caring for her children. (*Id.*)

Due to financial constraints, Sneed stopped taking her medications in late December 2010

16

or early January 2011. (*See* Tr. 406.) As she stopped Zoloft, she experienced a "severe" depressive state and motivation drop. (*Id.*) She had thoughts of committing suicide via overdose. (*Id.*)

A week prior to her January 26, 2011 appointment with Dr. Stipic, Sneed had restarted Zoloft. (*Id.*) Dr. Stipic noted that this "lift[ed]" the depression and that Sneed was feeling better and attending to her activities of daily living and instrumental activities of daily living. (*Id.*)

A March 2011 visit with Dr. Stipic is Sneed's last mental-health treatment reflected in the administrative record. Dr. Stipic noted that Sneed had been taking her medications, and without side effects. (Tr. 404.) Sneed denied panic attacks and described her mood as "ok." (Tr. 404.) She rated her "depressive cycle" at the three-out-of-ten level. (Tr. 404.) Her focus and concentration were "stable." (*Id.*)

On March 21, 2011, Dr. Stipic wrote a letter to Sneed's social security disability counsel (Tr. 403.) She explained,

> As evident in the previous forms (Mental Residual Functional Capacity Questionnaire) completed on May 27, 2010 Alissa Sneed has continued to suffer from agitated and depressive states which have been totally disabling since my last review.
>
> Please see enclosed questionnaire.

(Tr. 403.)

### C. Testimony at the Hearing Before the ALJ

In May 2011, Sneed testified before ALJ Poulose. Sneed explained that she stopped working as a bus driver because her "coordination [was] affected" and it was difficult for her to "multitask" while driving the bus. (Tr. 46.) When the ALJ asked if Sneed had problems driving her car, she responded, "Sometimes. Not all the time. . . . [W]ith the neurological disorder, sometimes I get jittery and nervous and I get real nervous in traffic. So I don't ever drive for long periods of time,

even when I have good days." (Tr. 48.)

Sneed's testimony reflects that she was capable of a wide range of daily activities despite her SCA2. She acknowledged that the neurological condition did not yet affect her ability to take a bath, fix her hair, or put on her clothes, socks, or shoes. (Tr. 48.) She also said that she could wash the dishes but "sometimes . . . dropp[ed] things." (Tr. 49.) She did not have problems cutting herself when slicing vegetables, and she said she could hold a fork, knife, pen, and pencil. (Tr. 58.) She did, however, use a straw to drink. (*Id.*) Sneed also said she was capable of doing the laundry and going grocery shopping. (Tr. 48.) Regarding the latter, she stated that she could take a 24-pack of soda from the shelf and place it in her shopping cart and could carry it from her car to her apartment. (Tr. 49-50.) Sneed also stated that, between one to three times a month, she would spend an hour going door to door for religious work. (Tr. 50.) She needed breaks, however: "during the hour, I may rest two to three times. . . . I get shaky and my walking gets bad. I look like I would appear to be drunk." (*Id.*) Sneed provided that she would shake while sitting too: "I'm shaking a little bit right now." (*Id.*)

As for her lupus, Sneed said, "I have pain in my legs and my knees, my hips, and so it hurts to go up and down steps." (Tr. 53.) Sneed said she took ibuprofen (800 mg) for pain. (*Id.*) "I don't have to take it like every day twice during or anything. It's as needed, and most of the time I just try to endure the pain because I don't really like taking medicine." (Tr. 53.)

Sneed also testified to her mental and emotional impairments and the effect of medication on these conditions. She stated that with her depression, "some days I don't even get out the bed." (Tr. 48.) When asked how often, Sneed responded, "Maybe two to three times a week." (Tr. 55.) She also provided that her attention span was "pretty short." (Tr. 51.) When asked if she could pay attention for an entire movie, Sneed responded, "I guess it depends on the movie. If I'm really

18

interested." (Tr. 52.) Sneed said she was taking Zoloft, Abilify, Xanax, and Trazodone for her

depression. (*Id.*) In explaining the effect of these medications, Sneed said,

> well, it's hard for me to really notice how it helps and how it doesn't,
> but the people around me, like my parents, they'll ask me like have
> you been taking your medication? They notice a change in me. I
> guess – and if I go for an extended period of time without taking it,
> I notice that I get super sad, maybe suicidal. I don't get out the bed.
> I don't do anything.

(Tr. 54.) She said that she did not feel suicidal and that her "mood [wa]s pretty stable" when on

medication. (Tr. 60.) But, even with her medications, she would still feel sad and sometimes not get

out of bed. (Tr. 54-55.) The ALJ asked, "Now, what about remembering to take your medication?

Any problems doing that?" (Tr. 57.) Sneed responded, "Yes. It's very hard for me to remember to

take my medicine every day." (*Id.*)

On a typical day—apparently not the two or three times per week that Sneed stayed in

bed—Sneed would help her children, then aged eight and ten, get to and from school. (Tr. 45, 55.)

She would wake up a bit before 7:00 a.m. and iron their clothes, "tell them to wash up and get

dressed." (Tr. 55.) She then dropped them off at school, which was "maybe two minutes away." (*Id.*)

When she returned home, she would "get right back in . . . bed for maybe two or three hours." (*Id.*)

She would then eat and, depending on the day, go to a doctor's appointment or walk on the treadmill

(while holding the handles). (*Id.*) After that, "I don't want to sound lazy, but I promptly get back in

the bed until it's time to get the kids from school. Then I get them, come home, make them some

dinner and get back in bed." (*Id.*)

At the hearing, the ALJ asked a vocational expert whether there would be jobs for a

hypothetical individual with limitations that the ALJ thought were comparable to Sneed's. In

particular, the ALJ asked the vocational expert to consider a hypothetical person of Sneed's age,

education, and work experience who could perform "sedentary" work without "even moderate" exposure to unprotected heights, moving machinery, commercial driving, climbing ladders, or climbing scaffolds, and without "fine precision work." (*See* Tr. 66-67.) The type of work the hypothetical person could perform was further limited to "unskilled" without "actual interactions with the public and only occasional interactions with coworkers." (*Id.*) The expert testified that this person could work as a hand packager, assembler, and sorter, each having tens of thousands of positions in the national economy. (Tr. 67-68.)

## II. THE ALJ'S APPLICATION OF THE DISABILITY FRAMEWORK

Under the Social Security Act, disability insurance benefits and supplemental security income "are available only for those who have a 'disability.'" *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505 (DIB); 20 C.F.R. § 416.905 (SSI).

The Social Security regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> 1. If claimant is doing substantial gainful activity, he is not disabled.

> 2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

> 3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. Even if claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that accommodates his residual functional capacity and vocational factors (age, education, skills, etc.), he is not disabled.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997); *see also* 20 C.F.R. §§ 404.1520, 416.920. "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health and Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

ALJ Poulose applied this five-step framework as follows. At step one, she found that Sneed had not engaged in substantial gainful activity since the alleged disability onset date of June 22, 2009. (Tr. 28.) At step two, she found that Sneed had the following severe impairments: spinocerebellar ataxia, lupus, and depression. (*Id.*) Next, the ALJ concluded that none of these impairments, alone or in combination, met or medically equaled a listed impairment. (Tr. 29.) Between steps three and four, the ALJ determined that Sneed had the residual functional capacity to perform "sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except unskilled work, with only occasional co-worker contact and no public contact, avoiding even moderate exposure to unprotected heights, moving machinery, commercial driving, ladders, or scaffolds, and no fine precision work." (Tr. 30.) At step four, the ALJ found that Sneed was unable to perform any past relevant work. (Tr. 34.) At step five, the ALJ found, based on the vocational expert's testimony, that sufficient jobs existed in the national economy for someone of Sneed's age, education, work experience, and residual functional capacity. (Tr. 34-35.) The ALJ therefore concluded that Sneed was not under a "disability" as defined by the Social Security Act from the alleged onset date

through the date of her decision. (Tr. 35.)

## III. STANDARD OF REVIEW

This Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited: the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted).

Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted); *see also Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, the Court is limited to an examination of the record and must consider that record as a whole. *Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been

cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247.

## IV.  ANALYSIS

Sneed raises four claims of error on appeal to this Court. Sneed claims that the ALJ erred in rejecting the opinions of her treating sources, Dr. Garbern and Dr. Stipic, and also failed to give the requisite "good reasons" for doing so. (Pl.'s Mot. Summ. J. at 6, 9-10, 12, 13.) She also argues that the ALJ erred in discounting her "complaints of pain, limitations and credibility." (*Id.* at 6; *see also id.* 12-13.) Sneed further claims that the ALJ impermissibly translated raw medical data into functional limitations and thereby erred in assessing her residual functional capacity. (*Id.* at 6, 10-11.) Sneed also asserts that the ALJ erred in concluding that she had "mild" as opposed to more severe limitations in concentration, persistence, or pace. (*Id.* at 8.)

The Court concludes that the ALJ erred in assessing Dr. Stipic's treating-source opinion. The Court further finds that the ALJ failed to adequately explain how she accounted for Sneed's limitations in concentration, persistence, or pace.

### A. The ALJ's Assessment of the Treating-Source Opinions

Because, if correct, they would have the broadest impact on the ALJ's analysis, the Court first considers Sneed's claims that the ALJ improperly rejected the treating-source opinions of record.

As an initial matter, the Court finds that Dr. Garbern and Dr. Stipic, by virtue of their

23

familiarity with Sneed, were "treating" sources as that term is used in the social security regulations. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("A physician qualifies as a treating source if the claimant sees her 'with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the] medical condition.' A physician seen infrequently can be a treating source 'if the nature and frequency of the treatment or evaluation is typical for [the] condition.'" (quoting 20 C.F.R. § 404.1502)). Indeed, the Commissioner does not argue otherwise. Dr. Garbern saw Sneed for her spinocerebellar ataxia at least three times over approximately a one year period, and Dr. Stipic saw Sneed for her depression and anxiety dozens of times over the course of two-and-a-half years. Both were familiar with how Sneed's conditions evolved over time.

As treating sources, a special rule applied to their opinions. In particular, the ALJ was required to give their opinions "controlling weight" if she found "the opinion[s] 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial evidence in [the] case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting former 20 C.F.R. § 404.1527(d)(2) now § 404.1527(c)(2)); *see also Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). And, under the treating-source rule, where an ALJ finds that a treating physician's opinion is not entitled to "controlling weight," there remains a rebuttable presumption that the opinion is entitled to "great deference." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4. To rebut the presumption, the ALJ must show that substantial evidence supports not deferring to the treating source. *See Rogers*, 486 F.3d at 246. Further, a procedural right accompanies the deference owed to treating sources: the ALJ must provide the claimant and a

24

reviewing court with "good reasons" for not deferring to a treating-source opinion. *See Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d at 243; *Wilson*, 378 F.3d at 544.

As detailed below, the Court finds that the ALJ reasonably discounted the opinion of Dr. Garbern and adequately explained her reasons for doing so. The ALJ did not, however, provide "good reasons" for rejecting Dr. Stipic's opinion.

### 1. Dr. Garbern's Opinion

The ALJ assigned "little weight" to the Physical Residual Functional Capacity Questionnaire Dr. Garbern completed in May 2010. (Tr. 33.) There, Dr. Garbern opined that Sneed was incapable of even "low stress" jobs, that she could never lift an amount even less than ten pounds, and that Sneed could never twist, stoop, or crouch. (Tr. 33, 391-93.) In rejecting these limitations, the ALJ provided that Dr. Garbern's findings were not supported by his own treatment notes and were inconsistent with his contemporaneous belief that Sneed was probably capable of "perform[ing] some job tasks." (Tr. 33.)

The Court believes that these conclusions were reasonable and that the ALJ explained her reasons for them well enough. As summarized in detail above, Dr. Garbern's treatment notes prior to his May 2010 opinion indicate that Sneed was not yet suffering serious SCA2-related limitations. (Tr. 330, 334, 526.) Indeed, it appears that Dr. Garbern's only significant examination finding was that Sneed had mild or ("perhaps slightly" more than mild) difficulty with tandem walking. (Tr. 330, 334, 526.) Further, as the ALJ recognized, Sneed testified that her SCA2 did not prevent her from performing a wide-range of daily activities, including some that involved considerable coordination. (Tr. 31, 48-50, 58.)

It is true that Dr. Garbern buttressed his opinion by noting that Sneed's depression

25

contributed to her physical condition. (Tr. 390.) But it does not appear that he had great familiarity

with the severity of Sneed's depression. *See* 20 C.F.R. § 404.1527(c)(2)(ii) ("For example, if your

ophthalmologist notices that you have complained of neck pain during your eye examinations, we

will consider his or her opinion with respect to your neck pain, but we will give it less weight than

that of another physician who has treated you for the neck pain."); *see also* 20 C.F.R.

§ 404.1527(c)(5) ("We generally give more weight to the opinion of a specialist about medical

issues related to his or her area of specialty than to the opinion of a source who is not a specialist.").

The record reflects that Dr. Garbern only saw Sneed three times before offering his opinion. In

March 2009, Dr. Garbern wrote, "her affect appeared possibly mildly depressed, but she was quite

pleasant and appropriate through the evaluation." (Tr. 333.) In November 2009, Dr. Garbern noted,

"[s]he does appear to be mildly depressed and somewhat anxious . . . ." (Tr. 330.) And in May 2010,

"She states that . . . she has been treated for depression and is back on her antidepressant, which has

ameliorated the situation somewhat. . . . She does appear mildly depressed and anxious; however,

appropriate for her situation, I think." (Tr. 525.) None of the statements suggest that Dr. Garbern

thought that Sneed's depression significantly affected her ability to function. The ALJ was therefore

not required to give much weight to Dr. Garbern's finding that Sneed's depression contributed to

her physical condition.

In all then, the ALJ both reasonably discounted Dr. Garbern's opinion and adequately

explained to Sneed and this Court why she did so. *See Gayheart*, 710 F.3d at 376; *Rogers*, 486 F.3d

at 243.

26

### 2. Dr. Stipic's Opinion

The ALJ found Dr. Stipic's May 2010 opinion that Sneed lacked the functional ability to perform a number of unskilled work tasks "unpersuasive" and assigned it "little" weight. (Tr. 34.) According to the ALJ, "the medical evidence of record fail[ed] to support it." (Tr. 34.) She explained, "Indeed, treatment notes show the claimant reported that when taking her medication, she had more energy, and felt either only episodic irritability or no irritability or sadness at all. Exhibit 7F, page 6 [Tr. 357] and Exhibit 15F, page 12 [Tr. 413]." (Tr. 34.)

This explanation for rejecting Dr. Stipic's opinion fails to comply with the articulation requirement of the treating source rule. As noted, accompanying the deference owed to a treating-source opinion is a procedural requirement: if an ALJ assigns less than "controlling" weight to a treating physician's opinion, the ALJ must supply the claimant (and the court) with "good reasons" for the weight assigned to the opinion. The purpose of this explanatory requirement is "to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that his physician has deemed him disabled and therefore might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied," to "ensure[] that the ALJ applies the treating physician rule," and to "permit[] meaningful review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544 (internal quotation marks omitted); *see also* S.S.R. 96-2p, 1996 WL 374188, at *4-5. This procedural safeguard of reasons is a substantial right: abridgement typically warrants remand even if substantial evidence supports the ALJ's disability determination. *See Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007); *Wilson*, 378 F.3d at 544.

Here, the ALJ did not provide Sneed with a sufficient explanation for rejecting the opinion

27

of her long-time treating psychiatrist. In particular, the ALJ's rationale rested on a critical assumption that was not explained. The ALJ thought, based on her review of Dr. Stipic's treatment notes, that *when Sneed was compliant with her medications* her limitations were much less severe than indicated by Dr. Stipic in her May 2010 opinion. (Tr. 34.) The ALJ therefore assumed, without explanation, that it was proper to compare Sneed's medication-compliant condition against Dr. Stipic's functional limitations. Yet Dr. Stipic's treatment notes (and Dr. Manganas's) reflect that Sneed was rarely, if ever, compliant with her medications for an extended period; indeed, their records are replete with notations of noncompliance. (Tr. 236, 245, 249, 258, 264-65, 271, 280, 282, 286, 299, 321, 353, 411, 414.)

Apparently, the explanation for the ALJ's assumption is found in 20 C.F.R. § 404.1530(a). That regulation required Sneed to comply with recommended treatment in order to qualify for social security benefits. 20 C.F.R. § 404.1530(a) ("In order to get benefits, you must follow treatment prescribed by your physician if this treatment can restore your ability to work."); *see also* 20 C.F.R. § 404.1530(b). But 20 C.F.R. § 404.1530(a) does not prescribe an absolute rule. Subsection (c) of § 404.1530 states: "We will consider your physical, mental, educational, and linguistic limitations . . . when determining if you have an acceptable reason for failure to follow prescribed treatment." *See also* S.S.R. 82-59, 1982 WL 31384, at *2 ("Where the treating source has prescribed treatment clearly expected to restore ability to engage in any [substantial gainful activity] (or gainful activity, as appropriate), but the disabled individual is not undergoing such treatment, appropriate development must be made to resolve whether the claimant or beneficiary is justifiably failing to undergo the treatment prescribed."). The Sixth Circuit has noted, "For some mental disorders, the very failure to seek treatment is simply another symptom of the disorder itself." *White v. Comm'r*

28

*of Soc. Sec.*, 572 F.3d 272, 283 (6th Cir. 2009). In *White*, the Sixth Circuit cited *Pate-Fires v. Astrue*, 564 F.3d 935 (8th Cir. 2009), which noted, "federal courts have recognized a mentally ill person's noncompliance with psychiatric medications can be, and usually is, the result of [the] mental impairment [itself] and, therefore, neither willful nor without a justifiable excuse." *Pate-Fires*, 564 F.3d at 945 (internal quotation marks omitted, citing cases).

*Pate-Fires* involved a claimant suffering from schizoaffective disorder and in a subsequent case involving a claimant with depression (like Sneed) the Eighth Circuit distinguished *Pate-Fires* noting that the record did not provide an "express[] link" between the mental limitations and the claimant's noncompliance. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010). A court in this Circuit, upon reviewing *Pate-Fires*, *Wildman*, and two subsequent cases, provided this rule:

> [T]o establish a severe mental impairment as an acceptable reason excusing a claimant's adherence to a medical regimen including prescription psychiatric medications, the record must contain evidence expressly linking noncompliance with the severe mental impairment. The justifiability of noncompliance is a step four determination as to which the claimant bears the burden of proof.
>
> The requisite evidence of that link will preferably appear in an opinion or assessment by a medical source. Where such evidence does not exist or is unclear, counsel for claimants should request a consultative examination or testimony by a medical expert addressed expressly to the issue of a link between the mental impairment and failure to take prescription medication. Although a referral for a consulting examination and the calling of a medical expert remain within the discretion of the ALJ, a serious argument can be made under certain circumstances that refusal to obtain a further opinion constitutes reversible error given the Sixth Circuit's admonishment in *White* that "a mentally ill person's noncompliance with treatment 'can be . . . a result of the mental impairment itself and, therefore, neither willful nor without justifiable excuse' . . . ." Further, a claimant may strengthen the case for a reversal by raising the denial of a request for a consulting examination or a medical expert before the Appeals Council, but the failure to raise that issue in a request for review by the Appeals Council does not constitute a waiver thereof

for purposes of judicial review.

*Black v. Commissioner of Social Security*, No. 1:13 CV 229, 2013 WL 6837193, at *4 (N.D. Ohio Dec. 26, 2013) (footnotes and citations omitted).

Here, Dr. Stipic did not explicitly state that Sneed was non-compliant with her medications because of her mental impairments. But the administrative record was littered with warning signs. (Tr. 236, 245, 249, 258, 264-65, 271, 280, 282, 286, 299, 321, 353, 411, 414.) Indeed, at the hearing, the ALJ asked, "Now, what about remembering to take your medication? Any problems doing that?," with Sneed unequivocally responding, "Yes. It's very hard for me to remember to take my medicine every day." (Tr. 57.) Yet, the ALJ said nothing of this is in her narrative. Moreover, the Court notes that Sneed's treatment notes reflect that she frequently had financial difficulties securing the medications that she needed, in particular Lamictal. (Tr. 316, 318, 322, 406.) All of this stands out against the backdrop of the explanatory requirement of the treating-source rule, which requires ALJs to explain why the opinion of a long-time treating source should be rejected.

Several other considerations lead to the conclusion that the ALJ's explanation was inadequate. First, although an ALJ is not required to discuss each of the factors in 20 C.F.R. §§ 416.927(c), 404.1527(c) when assigning less than controlling weight to a treating-source opinion, *Tracy v. Comm'r of Soc. Sec.*, No. 11-15107, 2012 WL 3542477, at *11 (E.D. Mich. July 13, 2012), *report and recommendation adopted*, 2012 WL 3542460 (E.D. Mich. Aug. 16, 2012), an ALJ "must" consider those factors, *Rogers*, 486 F.3d at 242. And when an ALJ only discusses the factor that disfavors crediting the treating-source opinion, without discussing the factors that cut the other way, it permits an inference that the ALJ did not consider all that she should have. That inference is of some strength here given the amount of the treatment that Dr. Stipic provided to Sneed over

a two-and-a-half or three-year period. The ALJ said nothing of Dr. Stipic's great familiarity with Sneed's mental health. *See* 20 C.F.R. § 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."); 20 C.F.R. § 404.1527(c)(2)(ii) ("Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion."). Second, there was not contrary opinion evidence that the ALJ relied upon. The ALJ did not even mention Dr. Tripp's opinion. (*See generally*, Tr. 26-36.) And, although she credited Dr. Kelwala's findings about Sneed's short-term and immediate memory, the ALJ did not provide a good reason for discrediting Dr. Kelwala's findings that Sneed had psychomotor retardation and could not complete the serial sevens test, and that Sneed's SCA2 and depression were "significant factors" affecting her ability to work. (Tr. 29, 340-41.)

Additionally, even assuming the ALJ was correct that some of Sneed's depression-related symptoms were manageable when she was on her medications, the ALJ failed to recognize that Sneed continued to have considerable difficulty with attention and concentration when taking her medications. In October 2009, Sneed was taking Lamictal, yet Dr. Stipic noted, "focus [and concentration] fair for short periods only." (Tr. 319.) Similarly, in June 2010, Sneed was taking Lamictal and reported reduced depression but maintained that her attention was poor. (Tr. 413.) Even in March 2011, when Sneed reported depression at only the three-out-of-ten level, her focus and concentration were merely described as "stable" as opposed to "good" or "fair." (Tr. 404.) Accordingly, the ALJ did not adequately explain why she discredited Dr. Stipic's limitation that Sneed could not perform at a consistent pace without an unreasonable number and length of rest periods (Tr. 398).

31

In all, the ALJ's explanation for discrediting Dr. Stipic's opinion was insufficient. When an assumption is necessary to support a rationale, it should be explained unless it is obvious. Here, it was not. Accordingly, the Court recommends remand. *See Gayheart*, 710 F.3d at 380 (concluding that "in the end, a proper analysis of the record might not support giving controlling weight to the opinions of [the treating source]. But this circuit 'has made clear that [it] do[es] not hesitate to remand when the Commissioner has not provided good reasons for the weight given to a treating physician's opinion.'" (quoting *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011))); *Sawdy v. Comm'r of Soc. Sec.*, 436 F. App'x 551, 553 (6th Cir. 2011) ("When an ALJ violates the treating-source rule, '[w]e do not hesitate to remand,' and 'we will continue remanding when we encounter opinions from ALJ[s] that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion.'" (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009))).

Before turning to Sneed's remaining claims of error, the Court notes that, on remand, the ALJ should also reconsider Dr. Stipic's March 2011 letter. The ALJ gave the letter "little weight" because Dr. Stipic opined that Sneed could not work, which was a finding reserved to the ALJ. (Tr. 34.) To be sure, a statement that a claimant is "disabled" or "unable to work," even when made by a treating source, is not entitled to any special deference because that is a legal question reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(e)(1), S.S.R. 96-5p, 1996 WL 374183, at *5. But such opinions should not be entirely disregarded. S.S.R. 96-5p, 1996 WL 374183, at *5; *see also Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007). Moreover, in her March 2011 letter, Dr. Stipic reaffirmed her findings from May 2010. (*See* Tr. 403.) In fact, it appears that she included with her letter the May 2010 questionnaire. (*See id.*) Accordingly, Dr. Stipic's March 2011 letter did

more than conclusorily state that Sneed could not work. So the ALJ should address it further on remand.

### B. The ALJ's Credibility Assessment

If, on remand, the ALJ decides to credit (or partially credit) Dr. Stipic's opinions, it may be necessary to reevaluate the weight assigned to Sneed's testimony in general, with special attention to her testimony regarding her mental impairments. In hopes of streamlining proceedings on remand, the Court addresses Sneed's credibility argument.

Sneed claims that the ALJ erred as follows:

> The ALJ['s] decision recites that the plaintiff has medically determinable impairments that could reasonably be expected to cause her alleged symptoms, but her statements concerning intensity, persistence and limiting effects were not credible. (Tr. 31) It is submitted that the contrary is true. The plaintiff has documented spinocerebellar ataxia type 2. (Tr. 525-527) Her examinations confirmed the existence of ataxia, tremor and difficulty tandem walking. (Tr. 329-330, 525-526) She has occasional lupus joint pain and swelling of the hands and knees. (Tr. 478) On 4/12/11, treatment notes indicate complaints of chronic joint pain in the fingers and knees. (Tr. 520)

(Pl.'s Mot. Summ. J. at 12-13.)

This argument does not demonstrate that the ALJ reversibly erred in assessing Sneed's credibility. *See Daniels v. Comm'r of Soc. Sec.*, 152 F. App'x 485, 488 (6th Cir. 2005) ("Claimants challenging the ALJ's credibility findings face an uphill battle."); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (providing that a court is "to accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which [a court does] not, of observing a witness's demeanor while testifying"). As explained, the administrative record indicates that Sneed did not have SCA2-related symptoms that preclude a restricted range of

33

sedentary work during the disability period. The fact that Sneed had "mild" or "perhaps" more than mild difficulty with tandem walking (Tr. 330, 334, 526), but could walk normally (and on her heels and toes without difficulty), lends limited support to her claim that when she walked door to door for an hour, she needed to take two or three breaks because she would start to walk as though she were drunk. (Tr. 50-51.) More importantly, even if this testimony were fully credited, Sneed has not shown how it is inconsistent with the ALJ's restriction to "sedentary" work, an exertional level demanding only that Sneed stand or walk for two hours *total* in an eight-hour workday. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a); S.S.R. 83-10, 1983 WL 31251, at *5. As for Sneed's lupus, the corresponding treatment records indicate that her lupus was well-controlled and that she only took ibuprofen on an as-needed basis. (Tr. 53, 479, 492.) Finally, it is noteworthy that the ALJ rejected Sneed's testimony only to the extent that she alleged limitations greater than her residual functional capacity assessment. (Tr. 30-31.) And that assessment provided a number of limitations directed toward Sneed's lupus- and SCA2-related symptoms: sedentary work that did not involve "even moderate exposure to unprotected heights, moving machinery, commercial driving, ladders, or scaffolds, and no fine precision work." (Tr. 30.)

In all, especially given the deference owed to the ALJ's credibility assessment, Sneed has not shown that the ALJ erred in rejecting her allegations of limitations beyond those set forth in the ALJ's residual functional capacity assessment.

### C. The ALJ's Interpretation of Medical Records in Assessing Functional Capacity

Sneed, relying on *Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908 (N.D. Ohio 2008), claims that the ALJ was not competent to assess her residual functional capacity based on "bare medical findings" and without a "medical advisor's assessment." (Pl.'s Mot. Summ. J. at 11.)

34

Although this argument is underdeveloped, it appears that Sneed's claim is that because the ALJ rejected both Dr. Garbern's and Dr. Stipic's opinions, and did not rely on Dr. Tripp's opinion, she impermissibly acted as a medical expert in translating raw medical data into functional limitations.

The Court disagrees that the ALJ acted beyond her competency or statutorily granted authority.

The claimant in *Deskin* had multiple spinal impairments. 605 F. Supp. 2d at 910. These impairments were evaluated by a state-agency physician. *Id.* The problem was that the "transcript contain[ed] two years of medical records from the Cleveland Clinic" post-dating the state-agency opinion. *Id.* Further, "the ALJ proceeded to decide the case based on his analysis of the medical records, giving only passing mention to [the state-agency physician's] opinion." *Id.* The court explained, "Where the ALJ proceeds to make the residual functional capacity decision in the absence of a medical opinion as to functional capacity from any medical source, or, as here, with one made without the benefit of a review of a substantial amount of the claimant's medical records, there exists cause for concern that such substantial evidence may not exist." *Id.* at 911. The *Deskin* court reasoned that residual capacity opinions offered by medical experts (such as treating physicians and state agency physicians who review a claimant's medical records) are "critical" to an ALJ's residual functional capacity finding. *Id.* The court thus concluded, "In making the residual functional capacity finding, the ALJ may not interpret raw medical data in functional terms." *Id.* at 912.

*Deskin* has been criticized. In *Henderson v. Comm'r of Soc. Sec.*, No. 1:08 CV 2080, 2010 WL 750222, at *2 (N.D. Ohio Mar. 2, 2010), the court held "that *Deskin* . . . is not representative of the law established by the legislature, and interpreted by the Sixth Circuit Court of Appeals." The court further explained,

35

> The statute and regulations setting forth the procedure and criteria for the ALJ's decision require the ALJ to determine whether there is a medically determinable impairment, to review objective evidence, review listed impairments, and then determine the issue of medical equivalence of the applicant's symptoms or condition. 20 C.F.R. § 416.920a(c)(1), Pt. 404, Subpt. P., App. 1, and 416.925(e).

*Henderson*, 2010 WL 750222, at *2; *see also Williams v. Astrue*, No. 1:11-CV-2569, 2012 WL 3586962, at *7 (N.D. Ohio Aug. 20, 2012) ("But RFC is for the ALJ to determine, *see* 20 C.F.R. § 416.945(a); and *Deskin* 'is not representative of the law established by the legislature, and [as] interpreted by the Sixth Circuit Court of Appeals.'" (quoting *Henderson*, 2010 WL 750222, at *2)).

Following *Henderson*, the judge who authored *Deskin* explained that "[p]roperly understood, *Deskin* sets out a narrow rule that does not constitute a bright-line test." *Kizys v. Comm'r of Soc. Sec.*, No. 3:10 CV 25, 2011 WL 5024866, at *2 (N.D. Ohio Oct. 21, 2011). He then offered this clarification:

> [The rule of *Deskin*] potentially applies only when an ALJ makes a finding of work-related limitations based on no medical source opinion or an outdated source opinion that does not include consideration of a critical body of objective medical evidence. The ALJ retains discretion to impose work-related limitations without a proper source opinion where []the medical evidence shows "relatively little physical impairment" and an ALJ "can render a commonsense judgment about functional capacity."

*Kizys*, 2011 WL 5024866, at *2.

The Court need not decide whether to adopt the rule of *Deskin* as clarified in *Kizys* because this case falls outside their "narrow rule." In particular, Sneed has not identified any records that constitute "raw medical data," *Deskin*, 605 F. Supp. 2d at 912, that a lay person is not competent to interpret. And a review of Dr. Garbern's and Dr. Dhar's notes reveal "relatively little physical impairment" such that the ALJ was capable of rendering "a commonsense judgment" about Sneed's

physical functional capacity. *See Kizys*, 2011 WL 5024866, at *2. As for Dr. Stipic's notes, those are overwhelmingly comprised of Sneed's lay-person descriptions of her symptoms and there are few, if any, medical or clinical findings that are beyond a lay person's comprehension.

In short, Sneed has not demonstrated that the ALJ reversibly erred in determining her residual functional capacity while rejecting Dr. Garbern's and Dr. Stipic's opinions.

### D. The ALJ's Assessment of Sneed's Concentration, Persistence, or Pace Limitations

At step three of the five-step disability analysis, the ALJ concluded that Sneed only had "mild" difficulties in concentration, persistence, or pace ("CPP"). (Tr. 29.) The ALJ reasoned as follows:

> According to the findings of [Dr. Kelwala's] February 2010 consultative mental status exam, the claimant showed some psychomotor retardation, and she could not perform serial 7s correctly. The claimant's consultative mental status exam also showed she could repeat 5 numbers forward and 5 backward, and she could remember 2 out of 3 objects after 3 minutes. Exhibit 4F. Relying on the findings of the claimant's February 2010 mental status exam, the undersigned finds that the claimant has a mildly impaired ability to maintain concentration, persistence, or pace.

(Tr. 29.) Sneed claims that the ALJ erred in concluding that she had only "mild" limitations in CPP. (Pl.'s Mot. Summ. J. at 8.) In support, she relies on Dr. Tripp's Psychiatric Review Technique Form and Dr. Kelwala's consultative exam findings. (*Id.*) The Commissioner counters that Dr. Tripp's ultimate finding supports the ALJ's mental residual functional capacity assessment. (Def.'s Mot. Summ. J. at 22-23.) The Court believes that this case should be remanded for a reassessment of Sneed's difficulties in concentration, persistence, or pace.

First, Dr. Stipic's treatment notes indicate that Sneed continued to suffer from concentration or attention problems *even when she took her medication*. In October 2009, Sneed was taking

37

Lamictal, yet Dr. Stipic noted, "focus [and concentration] fair for short periods only." (Tr. 319.) Similarly, in June 2010, Sneed was taking Lamictal, reported reduced depression, but maintained that her attention was poor. (Tr. 413.) Even in March 2011, when Sneed reported depression at only the three-out-of-ten level, her focus and concentration were merely described as "stable" as opposed to "good" or "fair." (Tr. 404.) The ALJ did not discuss this evidence. Nor did the ALJ explain how Dr. Stipic's treatment notes undermine her finding that Sneed could not perform at a consistent pace without an unreasonable number and length of rest periods (Tr. 398).[2]

Second, the reasoning the ALJ did provide for concluding that Sneed had "mild" limitations in CPP was flawed. In his report, Dr. Kelwala indicated that reciting numbers and recalling objects were tests of "[m]emory." (Tr. 340.) As such, Sneed's ability to complete those tasks do not undermine Dr. Kelwala's expert impression that Sneed showed "some psychomotor retardation" or his finding that Sneed could not complete the serial sevens test—a test requiring concentration. The ALJ's reasoning does not explain how she accounted for these findings. Notably, the ALJ did not rely on Dr. Tripp's opinion and did not explain why she did not. (*See generally*, Tr. 26-36.)

In sum, the Court, and, more importantly, Sneed, are left to speculate as to what record evidence supports the ALJ's conclusion that Sneed's difficulties in CPP were mild. *See Stacey v. Comm'r of Soc. Sec.*, 451 F. App'x 517, 519 (6th Cir. 2011) (noting that an "ALJ's decision . . . must say enough 'to allow the appellate court to trace the path of his reasoning.'" (quoting *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)); *Lowery v. Comm'r of Soc. Sec.*, 55 F. App'x 333, 339 (6th Cir.2003) (noting that an ALJ "'may not select and discuss only that evidence that favors his

---

[2]Notably, in addressing Dr. Stipic's opinion in the context of the treating-source rule, this Court declined to find that the ALJ had reasonably rejected this particular limitation.

ultimate conclusion, but must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning.'" (quoting *Diaz*, 55 F.3d at 306)). Moreover, this error is not necessarily harmless. If Sneed had more than mild limitations in CPP, the question becomes whether, based on the record as whole, a limitation of "unskilled" work suffices to capture Sneed's limitations in CPP. *See Taylor v. Comm'r of Soc. Sec.*, No. 10-12519, 2011 WL 2682682, at *7 (E.D. Mich. May 17, 2011) (Michelson, M.J.) (noting that where a claimant has "moderate" difficulties in CPP, a limitation to "unskilled" work may be insufficient because "the difficulty of a task does not always equate with the difficulty of staying on task"), *report and recommendation adopted*, 2011 WL 2682892 (E.D. Mich. July 11, 2011) (Edmunds, J.). Especially given this Court's recommendation to remand for further assessment of Dr. Stipic's opinion, an ALJ rather than this Court should address that issue in the first instance. *Cf. White v. Comm'r of Soc. Sec.*, No. 12-12833, 2013 WL 4414727, at *27 (E.D. Mich. Aug. 14, 2013) ("Given the absence of a uniform, categorical rule, ALJs would greatly aid reviewing courts if they would explain why they are assigning claimants a 'moderate' limitation in CPP, and—more importantly—why the mental-capacity limitations (e.g., 'unskilled' work) in the residual functional capacity assessment and corresponding hypothetical fully account for that moderate rating.").

## V. CONCLUSION AND RECOMMENDATION

For the reasons set forth above, this Court finds that the ALJ did not provide a "good reason" for rejecting the opinions of Sneed's long-time treating psychiatrist, Dr. Stipic. Further, the ALJ did not adequately explain how Sneed can perform "unskilled" work despite her limitations in concentration, persistence, or pace. Accordingly, this Court RECOMMENDS that Sneed's Motion for Summary Judgment (Dkt. 10) be GRANTED IN PART, that the Commissioner's Motion for

Summary Judgment (Dkt. 14) be DENIED, and that, pursuant to sentence four of 42 U.S.C. § 405(g), this case be REMANDED for further proceedings.

## VI. FILING OBJECTIONS

The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within 14 days of service, as provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1981). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  February 3, 2014

40

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on February 3, 2014.


s/Jane Johnson
Deputy Clerk